**UNITED STATES BANKRUPTCY COURT
DISTRICT OF VERMONT**

_____

**In re:**
    **JAMES F. KING, III,**                            Chapter 7 Case
             **Debtor.**                                # 05-11454

_____
Filed & Entered
On Docket

**James F. King, III,**
             **Plaintiff,**                    05/11/07

    **v.**

                                                        **Adversary Proceeding**
**Vermont Student Assistance Corporation**                # 05-1061
**Wells Fargo Education Financial
Services, Educational Credit
Management Corporation,**
             **Defendants.**

_____

*Appearances:*      *James J. Cormier, Jr., Esq.*      *Gregory A. Weimer, Esq.*
                           *Bennington, Vt.*             *Burlington, Vt.*
                           *For the Plaintiff*            *For Defendant VSAC*

                                                          *Gary L. Franklin, Esq.*
                                                          *Burlington, Vt.*
                                                          *For Defendant ECMC*

**MEMORANDUM OF DECISION
G<small>RANTING</small> J<small>UDGMENT IN</small> F<small>AVOR OF THE</small> P<small>LAINTIFF</small>
<small>AND</small> A<small>GAINST</small> D<small>EFENDANTS</small> E<small>DUCATION</small> C<small>REDIT</small> M<small>ANAGEMENT</small> C<small>ORPORATION</small>
<small>AND</small> V<small>ERMONT</small> S<small>TUDENT</small> A<small>SSISTANCE</small> C<small>ORPORATION</small>**

     Plaintiff James F. King, III ("King" or the "Plaintiff") initiated the instant adversary proceeding against the Vermont Student Assistance Corporation ("VSAC"), Wells Fargo Education Financial Services, and Salle Mae Servicing Corporation for a determination of whether his student loans may be discharged in bankruptcy. The Court conducted a two-day non-jury trial on April 4 and 5, 2007, and took the matter under advisement. For the reasons set forth below, the Court determines that the Plaintiff has met his burden under the test enunciated by the Second Circuit in <u>Brunner v. New York State Higher Educ. Servs. Corp.</u>, 831 F.2d 395 (2d Cir. 1987) governing dischargeability of student loans, and therefore the Court grants judgment in favor of the Plaintiff.

**J<small>URISDICTION</small>**

     The Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 157(b)(2)(I). It is undisputed that this adversary proceeding is a core proceeding.

## PROCEDURAL BACKGROUND

On September 21, 2005, King filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code. Approximately two months later, on November 17, 2005, King filed a complaint to determine the dischargeability of his student loan debt. An Order Discharging Debtor was entered on January 10, 2006 (doc. # 5 in case # 05-11454).

In the adversary proceeding, Educational Credit Management Corporation ("ECMC") filed its answer as the real party in interest on the debt held by Sallie Mae and the majority of the debt held by VSAC. By order dated March 8, 2006, ECMC was substituted into the case as a party defendant in place of Sallie Mae. VSAC also filed an answer with respect to the debt it retained. Wells Fargo did not file an answer.

## THE FACTS

*1. The Undisputed Facts*

The parties have stipulated to the following facts:

1. James E. King, III, was born on April 29, 1968 in Vermont. He is now 38 years old.

2. Plaintiff currently resides with his parents, James King, Jr. and Mary King at 228 Putnam Street, Bennington, Vermont.

3. Plaintiff attended elementary and secondary schools in Bennington, Vermont and graduated from Mount Anthony Union High School in June of 1988.

4. In September 1988, Plaintiff began his post-secondary education at Johnson State College. His first semester went well as a government major. However, his second semester was very unsettled. His father (James King, Jr.) was a Vietnam Veteran who was suffering from post traumatic stress disorder and was suicidal. He was hospitalized at the VA center in White River Junction, Vermont. In May 1989, Mr. King dropped out of Johnson State College.

5. After working for awhile, Plaintiff went back to college at Northeastern University, Boston, Massachusetts in the fall of 1991 as a Political Science major. Later that year, Plaintiff's father had a major heart attack. Because of limited funds, Plaintiff was not able to visit him regularly.

6. In 1994, after a series of cooperative jobs/internships and fulfilling more degree requirements, Plaintiff began treatment with a school psychologist and psychiatrist who prescribed Prozac which Plaintiff took for a short period.

7. Plaintiff graduated from Northeastern University in fall of 1996 with a Bachelor of Science degree in political science.

8. After taking computer and business classes at Community College of Vermont in 1995, Plaintiff decided to go to graduate school at Schiller University in Paris, France to get a masters degree in International

2

Relations and Diplomacy. He graduated in 1998 with a Masters in International Relations and Diplomacy. He also pursued an M.B.A. simultaneously but was not awarded this degree as he failed his verbal exam. In graduate school his GPA exceeded a 3.0 average.

9. Plaintiff got married in 1997; however he and his wife separated in January 1999.

10. After returning from France, Plaintiff started to see another psychologist, Dr. Jean Sadlak who prescribed medication which Plaintiff did not want to take.

11. In March 2002, Plaintiff started to see Dr. Doris Russell and Dr. Catherine Hickey at United Counseling Services, in Bennington, Vermont for his emotional problems.

12. Mr. King is currently receiving Social Security disability for his mental health condition in the amount of $631.00 per month. He started receiving Social Security Disability in January 2005.

13. Mr. King received his discharge in bankruptcy on January 10, 2006.

14. On or about January 21, 1993, Plaintiff executed a promissory note in the amount of $4,000 with Sallie Mae Trust while in attendance at Northeastern University (the "First Note").

15. As of January 29, 2006, the balance on the First Note totaled $7,487.37.

16. ECMC is the current holder of the First Note.

17. Interest continues to accrue under the First Note at the rate of 6.5%.

18. On or about August of 2000, Plaintiff executed a consolidated note in the amount of $101,228.90 with the Vermont Student Assistance Corp. (the "Second Note").

19. As of January 29, 2006, the balance on the Second Note totaled $116,299.98.

20. ECMC is the current holder of the Second Note.

21. Interest continues to accrue on the Second Note at the rate of 7.75%.

22. Pursuant to applicable Federal Regulations and the terms of the First Note, a guaranty agency is entitled to add collection costs to the principal and interest balance due thereon.

23. Mr. King was informed of the William D. Ford Direct Loan repayment program offered by the Department of Education by letter to his attorney dated February 1, 2005.

24. As a matter of law, Mr. King is eligible for the Income Contingent Repayment Plan ("ICRP").

25. Using the on-line calculator available on the Department of Education's website, Mr. King's payments under the ICRP would be 0 given his current income level and marital status.

26. On or about December 23, 1995 Plaintiff executed an "Extra Education Loan Variable Rate Promissory Note and Disclosure

Statement" in the amount of $8,320.00 in favor of Vermont Student Assistance Corporation. This loan is designated as Group ID "D" in the Plaintiff's payment history with VSAC. (The "D loan")

27. As of January 22, 2007 the balance due on the "D loan" totaled $13,359.53.

28. On or about November 4, 1996 Plaintiff executed an "Extra Education Loan Variable Rate Promissory Note and Disclosure Statement" in the amount of $4,160.00 in favor of Vermont Student Assistance Corporation. This loan is designated as Group ID "G" in the Plaintiff's payment history with VSAC. (The "G loan")

29. As of January 22, 2007 the balance due on the "G" loan totaled $6,187.35.

30. Both the "D" and "G" loans continue to bear interest at a variable rate, equal to the average of the bond equivalent rates for the 91-day U.S. Treasury bills auctioned during the proceeding quarter plus three percent per annum during the life of the loans.

31. Both the "D" and "G" loans are private loans held by VSAC and are separate and distinct from the loans held by ECMC in this action.

(doc. # 35 in # 05-1061).[1]

## *2. The Trial Testimony*

At trial, the Plaintiff offered testimony about his psychological, employment, and financial history that was candid, credible and compelling. King stated that he was an "emotional wreck" by the time he began his undergraduate education at Johnson State College, and he attributed that primarily to the stresses of living with his father, a Vietnam veteran, who suffers from severe Post Traumatic Stress Disorder ("PTSD"). Upon graduation from Northeastern University in 1995, King went to France to pursue a Masters in International Relations and an MBA in International Business at Schiller International University in Paris, with the intent of ultimately working in a foreign embassy or other foreign service position. In 1997, he married a French woman. While attending Schiller University, he began looking for work both in Europe and in the United States. He stated that he applied for between 100 and 150 jobs but had no success procuring employment. Around that time, "things fell apart in [his] marriage" and, shortly after he received his Master's degree in December 1998, he returned to the United States without his wife. He realized the marriage was over and filed for divorce in May 1999. The Plaintiff began to live at home with his mother, who worked as a bookkeeper, his emotionally disabled father, and his younger brother Patrick, who suffered from schizophrenia and was verbally abusive to him. King applied for scores of jobs (Ex. 15, 20) again, and in August 1999 he was accepted into Americorps/VISTA. In that position, he earned $700 per month and lived at home. He testified that he decided to take this job, even though it was

---

[1] The Court notes that some of the dates contained in the Statement of Facts are incorrect. The documentary evidence submitted at trial as well as testimony showed, for example, that King began his post-secondary education at Johnson State in September 1987, not September 1988, and that King graduated from Northeastern University in 1994, not 1996.

4

not in the field in which he held a degree, because it covered the interest on his VSAC student loans for a full year. He left that job in August 2000 and immediately began searching for work. In April 2001, he accepted a position with Upward Bound to organize cultural events for disadvantaged children, again outside his area of expertise, so he could earn money to pay his student loans. In that position, he grossed $20,000 per year and made many payments on his student loans. At first, the job went well; however, as time went on, he began to have difficulty keeping up with his job responsibilities. After his boss became upset with him, King sought assistance from United Counseling Service ("UCS") in Bennington. In December 2001, he began seeing Dr. Doris Russell, a UCS psychologist, and in March 2002, he began seeing Dr. Catherine Hickey, a UCS psychiatrist. Over the years, he has continued to see Drs. Russell and Hickey. He testified that if he went off his medication, his mind started racing, his body became jittery and he did not care about much; while on medication, he felt those problems were "somewhat controlled." In May 2006, he had a breakdown accompanied by suicidal ideations and was hospitalized for eight days. King resigned from Upward Bound in August 2002 and worked at his uncle's failing pool hall business until January 2003. Despite applying for scores of jobs, he has not been employed since January 2003. In March 2004, he attended a three-week leadership institute in Washington, D.C. to make himself "more marketable" for government jobs on Capitol Hill. He has also been meeting with a state vocational rehabilitation counselor since October 2003 (Ex. G). Recently, Dr. Hickey referred him to a supported employment program ("SEP") associated with UCS that helps people with disabilities find jobs. King did not know how much such jobs would pay, the hours he would work, or what type of work would be involved, but he indicated a desire to investigate the SEP and explore whatever possibilities it offered. His first meeting with the SEP was scheduled for April 10, 2007 (a week after the trial).

King testified that he is "always tense," that since completing his education he has desperately wanted to find a job in government service and has persistently sought any employment that would help him pay his debts. However, he acknowledged he has not been successful, and by the time of the trial, he had no hope of finding the sort of job he aspired to while in college and graduate school. King expressed deep remorse about his lack of employment and the consequences that had on his creditors and parents.

The Court observed how the stress of the trial – testifying about his struggles and hearing others testify about his lack of success – affected the Plaintiff. While on the stand, he often became tearful, rocked back and forth, wrung his hands, wiped off the table, and avoided eye contact with the people in the courtroom. On occasion, when other witnesses began testifying about him, he left the courtroom.

King's mother, Mary King, testified about the history of her son's medical and emotional difficulties. While she was clearly a concerned and worried mother, the Court found her testimony to be candid and straightforward. She did not appear to exaggerate her son's condition; she simply described his myriad challenges and tribulations. She remarked that when he went to France, he was "upbeat and

5

hopeful about life," but that having his marriage fall apart was "the end of the line." She commented that her son was "not the same person he used to be," that he now eschewed conversations about politics and could not concentrate enough to read a book, although in the past these were his favorite pastimes. He had no relationships outside the family. He could not be around people. He needed medication to keep calm. She testified that she had paid off some of his private student loans and had advanced money to pay some of his VSAC loans in the hope that things would improve for him and that not being burdened by these debts would help him to get ahead in life. She described the stress the Plaintiff suffered as a result of receiving job rejection letters, having unpaid student loans, and living in a family where his brother and father have severe and sometimes explosive psychological ailments. She stated, "He's had a very bad couple of years," and "He seems to be a lost soul."

The Plaintiff's treating psychiatrist, Dr. Catherine Hickey, testified with clarity and objectivity as to the Plaintiff's past and present mental and emotional condition and offered her expert opinion as to his future prognosis. She presented a detailed description of her treatment of King since his initial consultation with her in March 2002. At that time, she diagnosed him with major depression and prescribed medication (Paxil) (doc. # 40, transcript of Dr. Hickey, at 7). She explained that King reported many of the symptoms of depression, including disturbance of sleep and appetite, problems with concentration, racing thoughts, decreased ability to function at work, and decreased motivation. Id. at 9. Over the course of treatment, Dr. Hickey adjusted King's medication depending on whether his condition was improving or deteriorating, and whether he experienced side effects. Id. at 7-8. At the beginning of King's treatment, she had inquired about manic episodes generally, but it was not until she had seen him "for a long time" that she realized he was having hypomanic episodes, characterized by decreased sleep and increased energy followed by a deep depression. Id. at 13-14. Having documented a "hypomanic episode followed by a depressive episode," she changed her initial diagnosis (of depression) to bipolar disorder. Id. at 14-15. She observed that this is a "lifelong disorder" and, because King "has had at least one, if not several hypomanic episodes [ ] he is definitely at risk of having others." Id. at 15. Dr. Hickey added that it had taken Dr. Russell and her some time to diagnose the bipolar disorder, and that this also explained why the earlier-prescribed medication had not caused King's symptoms to subside. She pointed out that the major depression diagnosis was subsumed into the bipolar diagnosis, as bipolar disorder is characterized by depression plus hypomanic episodes. Id. at 16.

Dr. Hickey testified that, whether or not the disorder was controlled by medication, King "definitely" had had self-destructive ideation, and while he was very intelligent and understood that suicide was "not a good idea," she was concerned that, "in the moment" he "could act on such a thought." Id. at 17. She had also observed that he exhibited some obsessive-compulsive traits which, in combination with his depression and anxiety, "impacts his . . . ability to be effective if he was working." Id. at 22-23.

6

She testified that when King is anxious, he is inwardly focused and distracted and his mind races, diminishing his ability to think and making it more of a struggle for him to get his work done. She analogized this situation – typical for King – to one where a person has to go to work on the same day a loved one had died and understandably cannot function at their usual level. Id. at 40. She asserted that these disorders could manifest during a job interview where King's high level of anxiety would then become "obvious to the interviewer and he wouldn't make a good impression." Id. at 26. Although Dr. Hickey testified that she does not believe King has cognitive limitations when he is in a fairly stable state, she noted that if he is "very anxious or depressed he does have cognitive distortions and his thinking can be affected." Id. at 39. Asked whether she believed he was malingering with regard to his psychological and emotional symptoms, she responded "No, absolutely not." Id. at 19.

Dr. Hickey stated that King was "very much affected" by the stress-inducing factors in his life, including his large debt, his brother's negative statements to him, his job difficulties, and his home environment. Id. at 18, 19, 24. She added that if he was working and could live in his own apartment, he would probably cope with his symptoms more effectively and his level of functioning would improve; however, "the jobs that he has had when he has been seeing me, he has run into problems, he has had difficulty with them," id. at 36, and despite his "tremendous effort" to find a job, his inability to do so "has been really a blow" to him, and is exacerbated by his poor coping skills. Id. at 21, 35.

Asked whether King's treatment had been unsuccessful, Dr. Hickey acknowledged that it could be categorized that way. She recounted that although initially King had improved, his condition had worsened over the past five years, pointing out that he has experienced "more severe depression, worsening of anxiety symptoms. He has been hospitalized once." Id. at 24. She also asserted, "I could definitely see that one could say that his treatment had not been successful for him," id. at 42, and "James. . . has not been getting better." id. at 27.

Dr. Hickey described her recent referral of King to UCS's SEP through which employers hire people they know have impairments and a job coordinator assists the patient by focusing on job skills and intervening if a workplace conflict occurs. She portrayed the jobs available through this program as part-time, minimum wage jobs that would not be likely to provide the economic means for a patient to live independently. Id. at 28-29. She added that, if the illness worsened, the patient might lose the position because it was not guaranteed employment and, unfortunately, the doors of many companies have been shut to this program. Id. at 30.

As to what King's future might hold, given his multiple disorders, Dr. Hickey testified that she did not believe that King would ever be able to obtain the type of employment that would enable him to pay off his student loans and live independently, that this situation would continue for an indefinite period, and that there was a possibility that it was permanent. Id. at 31.

7

Dr. Hickey mentioned that she and Dr. Russell, King's therapist, referred King to Dr. Dean Hammer for psychological testing about 18 months ago in order to give them more information, specifically because their treatment regimen had not produced the desired improvement. Id. at 11. The results of those tests, completed in September and October 2005, "didn't reveal anything that was really new that we weren't aware of. . . . The testing results said he was depressed, anxious, and also indicated perhaps a schizoid personality disorder and that we should consider schizoaffective disorder." Id. at 12. Dr. Hickey rejected Dr. Hammer's hypothesis that King might be suffering from schizophrenia-related disorders, because King did not have the delusions and hallucinations that typically accompany schizophrenia. Id. at 12, 43. She posited that the insight provided by psychological testing is limited, as it is based on the statistical result of picking a particular answer in a test and in her professional judgment, such testing did not "necessarily in itself provide a diagnosis." Id. at 12.

ECMC counsel asked Dr. Hickey about Dr. Hammer's recommendations, where he had written that King was "likely to benefit from a psychotherapy approach that focuses on helping him improve his coping and social skills to better manage his stressors and to develop a more fulfilling social life"; that "[a] cognitive behavioral approach may be useful in addressing his tendency to have distortions in his self-image, his view of others, and his feelings about his future"; and that "[i]f the treatment could help him develop his self-confidence and to better manage his emotional stress, perhaps he could be able to actualize the potential that this level of academic achievement suggests." (Id. at 44 & Ex. H). ECMC counsel remarked that, even though the evaluation noted possible schizophrenic tendencies, it was "considerably more hopeful" than the prognosis Dr. Hickey had provided. Id. at 45. Dr. Hickey conceded that the report was more hopeful than her current prognosis, and then pointed out the importance of evaluating Dr. Hammer's conclusions in context. She remarked, "it is the same kind of hope that I had on initially seeing James and for the first several years of seeing him. It is hard to understand how someone who could be so successful academically could be doing as poorly as he is." Id.

ECMC counsel also questioned Dr. Hickey about the responses she had made on a one-page document entitled "Total and Permanent Disability Addendum Request" which she had signed in July 2006 in support of King's application to have his loans discharged. Dr. Hickey had checked a box stating that King was "temporarily totally disabled."  Underneath the box, in parenthesis, it said "please indicate temporary if James' condition may improve over the long-term." Id. at 38 & Ex I. Dr. Hickey had written on the form the caveat that "James is probably permanently disabled but I cannot say absolutely that there is no hope." Ex. I. Counsel asked whether she could offer a positive prognosis if the circumstances changed and King was working and, specifically asked her whether, if King's economic stress was reduced, his mood and medical condition would both improve. Dr. Hickey answered that, while she did not have a crystal ball, King's course had been in a downward direction and, "although he did better while

8

things were going well, things didn't go well for very long." Id. at 36. Counsel asked: "I gather from Exhibit I that Mr. King's case in your assessment at that time was not totally hopeless?" to which Dr. Hickey responded, "That is correct." Id. at 39.

The Court admitted ECMC's witness, Gregory LeRoy, a certified rehabilitation counselor and vocational evaluator, as an expert. LeRoy stated he had conducted a vocational assessment of King – reviewing UCS records, vocational counselor notes, legal filings, and conducting an in-depth "diagnostic interview" of King – and described his task as looking at the feasibility of King's finding employment. He criticized Dr. Hickey's testimony, asserting that it was beyond the scope of her expertise to assess King's abilities to obtain and retain employment, and opining that she had mistakenly based her conclusions on King's lack of success in finding a paid position without taking into account the many volunteer jobs he had had. He also suggested that Dr. Hickey's testimony should be discounted because she had changed King's diagnosis from severe depression to bipolar disorder and had offered a different diagnosis than Dr. Hammer. He hypothesized that the variance in the diagnoses might have stymied the Debtor's improvement. He also critiqued King's job search efforts, stating that sending out resumes and cover letters was among the top three or four worst ways to find a job. In his opinion, it was not surprising that King's job-seeking efforts had failed since King had used ineffective techniques.

With regard to King's ability to return to work, LeRoy viewed King's work history as presenting a glass half-full or half-empty phenomenon, given his psychological difficulties on one hand and his ability to complete a rigorous education and hold both volunteer and paid jobs on the other. LeRoy claimed that King would have been better served if he had been referred to the SEP earlier. He saw Dr. Hickey's decision to refer King only recently as another flaw in her treatment plan. He was of the opinion that King should seek an entry-level professional position in human resources or marketing – jobs consistent with King's education and interests – subject to the concurrence of the SEP counselors. Asked what kinds of entry-level positions were available in the Bennington area, LeRoy testified that although he could not speak to actual job availability, he knew that human resources jobs exist in any market. Having looked at "the southern part of Vermont," he posited that the mid-range for wages was from mid-$20,000 to low $30,000. He also noted that information record clerks and order clerks were paid similar wages. LeRoy claimed that if King could land such a job, it was impossible to tell what would happen, given his history, but supported employment would maximize his chances for success, and that it is "more probable than not" that, with supported employment, King could step into a white-collar position and succeed. LeRoy acknowledged that his hypothesis was based on the premise that employers with white-collar entry-level human resources jobs would participate in the SEP (even though the majority of those enrolled in the program have been placed in unskilled jobs), and the further premise that once King was employed, his level of functioning at the job site would not be affected by his various disorders or, if it was, his job

9

counselors would be able to resolve any performance issues.

## DISCUSSION

Section 523(a)(8) of the Bankruptcy Code provides that:

> (a) A discharge under [certain sections of the Code] does not discharge an individual debtor from any debt –
>
> (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for –
>
> (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a government unit . . .

A student loan will not be discharged unless the debtor "affirmatively secures a hardship determination." Tennessee Student Assistance Corp. v. Hood, 541 U.S. 440, 450 (2004).

In the Brunner case, the Second Circuit announced the standard for "undue hardship" that this Court must apply for a debtor to have his or her student loans discharged as an undue hardship. The standard requires the debtor to establish that:

> (1) the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;
>
> (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
>
> (3) the debtor has made good faith efforts to repay the loans.

Brunner, 831 F.2d at 396. It is the debtor's burden to prove each of the three prongs of the Brunner test. In re Lehman, 226 B.R.805, 808 (Bankr. D.Vt. 1998). If a debtor cannot satisfy every prong of the Brunner test, he or she is not entitled to discharge the student loan. Williams v. New York State Higher Educ. Servs. Corp. (In re Williams), 296 B.R. 298, 302 (S.D.N.Y.2003) (quoting Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish ), 72 F.3d 298, 306 (3d Cir. 1995)); see also In re Thoms, 257 B.R.144, 148 (Bankr. S.D. N.Y. 2001); Lehman, 226 B.R. at 808. The debtor must prove his case by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 287 (1991); In re Maulin, 190 B.R. 153 (Bankr. W.D.N.Y. 1995). The determination of undue hardship is case- and fact-specific. Id. at 156.

### A. The "Minimal Standard" Prong

To prove the "minimal standard" prong of the Brunner test, the Plaintiff must show that he cannot, based upon his current income and expenses, both maintain a "minimal" standard of living and repay his student loans. Neither ECMC nor VSAC contested that King, who receives only $631 per month in Social Security Disability payments, meets this prong of the Brunner standard.

Based upon the record presented, the Court finds that Plaintiff has sustained his burden of proof on the minimal standard of living prong of the Brunner test.

### B.     The "Future Prospects" Prong

The "undue hardship" standard adopted by the Second Circuit to assess whether student loans can be discharged was first forged by the district court in Brunner v. New York State Higher Educ. Servs. Corp., 46 B.R. 752 (S.D.N.Y. 1985). Adjudication of this adversary proceeding turns on whether the Debtor has sustained his burden of proof on the second component of the Brunner test, referred to as the future prospects prong, and requires the Court to scrutinize more carefully the standard for this part of the test.

*1.     Is Hopelessness Required in Order to Find Undue Hardship?*

In Brunner, the district court observed that the term "undue hardship" had not been defined in the Code but had been "lifted verbatim from the draft bill proposed by the commission on the Bankruptcy Laws of the United States." Id. at 754. By placing the adjective "undue" before hardship, the district court asserted that "Congress viewed garden-variety hardship as insufficient excuse for a discharge of student loans, but the statute otherwise gives no hint of the phrase's intended meaning." Id. at 753. In its effort to apprehend the meaning of "undue hardship," the district court opined that "many courts have required more than a showing on the basis of current finances that loan repayment will be difficult or impossible." Id. At this point, the court approvingly cited In re Briscoe, 16 B.R. 128, 131 (Bankr. S.D.N.Y. 1981), which described this additional showing in dramatic terms: "dischargeability of student loans should be based upon the certainty of hopelessness, not simply a present inability to fulfill financial commitment." In the next sentence, the Brunner district court wrote, "[s]tated otherwise, the debtor has been required to demonstrate not only a current inability to pay but additional circumstances which strongly suggest that the current inability to pay will extend for a significant portion of the repayment period of the loan." Id. This sentence, not the reference to a "certainty of hopelessness," became the second prong of the undue hardship standard set out by the district court. Id. at 756.

The Brunner district court collated formulations of the undue hardship test fashioned by other courts that had sought to extrapolate debtors' current difficulties in repaying their student loans and convert that assessment into a prediction about their future ability to repay. These courts had required debtors to show "unique" or "exceptional" circumstances in their current situations that would clearly limit their future abilities to earn a living, support themselves, and repay their loans. Having reviewed numerous student loan discharge cases, the Brunner district court noted that oftentimes courts have found undue hardship "most frequently as a result of illness," a large number of dependents, or a combination of both. Id. at 755 (citations omitted). In fact, Briscoe, although cited for the "certainty of hopelessness" phrase, actually settled upon an "exceptional hardship" standard for the future prospects prong of the

11

undue hardship test, holding that there were "no exceptional circumstances which justify forgiveness of this debtor from liability on her indebtedness" given that she was "healthy, currently employed, skilled and ha[d] no dependents or extraordinary, non-discretionary expenses." Briscoe, 16 B.R. at 131.

The Second Circuit, in adopting the Brunner district court's three-part undue hardship standard, explained that the showing required by part two of the test

> is also reasonable in light of the clear congressional intent exhibited in section 523(a)(8) to make the discharge of student loans more difficult than that of other nonexcepted debt. Predicting future income is, as the district court noted, problematic. Requiring evidence not only of current inability to pay but of additional, exceptional circumstances, strongly suggestive of continuing inability to pay over an extended period of time, more reliably guarantees that the hardship presented is 'undue.'

831 F.2d at 396. Although the Second Circuit adopted the district court's three-part analysis and "undue hardship standard," nowhere did it require "a certainty of hopelessness" to warrant discharge.

Nevertheless, numerous courts, including this one, have repeated the "certainty of hopelessness" phrase as if it were an indispensable element of the future prospects prong of the undue hardship standard. The phrase emphasizes that the debtor's circumstances must be more than exceptionally difficult, and that the debtor must clear a very high hurdle in order to discharge his or her student loans. In recent cases tried before this Court, the evidence at trial concerning the debtors' emotional and mental disabilities has been insufficient to meet the debtors' burden on the second Brunner prong. See Congdon v. ECMC (In re Congdon), __ B.R. __, 2007 WL 942202 (Bankr. D.Vt. Mar. 29, 2007); Waters v. ECMC (In re Waters), 2007 WL 419538 (Bankr. D.Vt. Feb. 2, 2007). Evaluating a debtor's future ability to repay student loans as a result of current psychological problems was not a close issue in those cases and therefore whether the debtor had to show a "certainty of hopelessness" or some less stringent standard under the future prospects prong was never called into question. The phrase was relegated to the legal background until ECMC specifically argued in this case that because the Plaintiff's psychiatrist could not absolutely say that his situation was hopeless, the Plaintiff *de facto* failed to meet his burden under the Brunner future prospects test.

ECMC's reliance on the "certainty of hopelessness" is misplaced. First, although the phrase was used in the Brunner district court opinion, that court was quoting a bankruptcy court case, Briscoe, that had used the phrase descriptively, *i.e.*, in dicta. The phrase was not incorporated as part of the undue hardship standard either in Briscoe or by the Brunner district court, or in the Second Circuit affirmance of Brunner. Second, "hopelessness" is as vague as it is completely subjective and speculative. It requires the person who testifies to it or the court that invokes it to be able to predict with 100% certainty that the debtor's future is "incapable of redemption or improvement." Webster's Ninth New Collegiate Dictionary (1985). Such a conclusion has self-evident limitations as the human spirit and the multitude of

12

circumstances that impact the human condition simply cannot be predicted with any reliable level of certainty.

A number of courts have recognized the quandary presented by concentrating on a showing of "a certainty of hopelessness" in order to meet the second Brunner prong, and have commented that the Briscoe-Brunner phrase has seemed to take on a life of its own, divorced from both its original context and the actual standard. In Hoskins v. ECMC (In re Hoskins), 292 B.R. 883 (Bankr. C.D. Ill. 2003), the court traced how the phrase had gained currency by repetition: the Brunner district court quoted Briscoe, and the Seventh Circuit, in adopting the Brunner standard, simply repeated the phrase: "The court in Goulet [v. ECMC, 284 F.3d 773, 779 (7th Cir. 2002)] was not devising a new standard, nor even tweaking the existing one, but merely repeating a verbalism of long standing." 292 B.R. at 887. The Hoskins court went on to say, "The test is not, as portrayed by ECMC, that a debtor must demonstrate his future holds an 'absolute' certainty of hopelessness, but rather that there be additional circumstances which make it reasonably certain that the debtor's circumstances are unlikely to improve." Id. The court hearkened back to the actual text of the Brunner test (adopted by the Seventh Circuit in Goulet) and refused to apply an amorphous hopelessness standard to the case before it.

This position has been echoed by other courts. In ECMC v. Polleys, the Tenth Circuit wrote:

> [C]ourts need not require a 'certainty of hopelessness.' Instead, a realistic look must be made into debtor's circumstances and the debtor's ability to provide for adequate shelter, nutrition, health care, and the like. Importantly, 'courts should base their estimation of a debtor's prospects on specific articulable facts, not unfounded optimism,' and the inquiry into future circumstances should be limited to the foreseeable future, at most over the term of the loan. Robert F. Salvin, *Student Loans, Bankruptcy, and the Fresh Start Policy: Must Debtors Be Impoverished to Discharge Educational Loans?*, 71 Tul. L.Rev. 139, 197 (1996).

356 F.3d 1302, 1310 (10th Cir. 2004). Accord Tennessee Student Assistance Corp. v. Hornsby, 144 F.3d 433, 437 (6th Cir. 1998) ("Congress has not defined 'undue hardship,' leaving the task to the courts. Courts universally require more than temporary financial adversity and typically stop short of utter hopelessness.").

One court in this circuit has unequivocally rejected this approach, stating: "Despite the growing acceptance of the 'certainty of hopelessness' standard, I submit that the notion that Brunner commands such a showing is simply wrong." Doherty v. United Student Aid Funds, Inc., 219 B.R. 665, 671 (Bankr. W.D.N.Y. 1998). That court explained that "[a]ny fact finder that must find the future to a 'certainty' is charged with an impossible task," id., and pointed out that at the time Brunner was decided, the Circuit was concerned with abuse by student loan debtors and that the "additional circumstances" prong "was simply an attempt . . . to lend objectivity to the 'undue hardship' inquiry." Id. Finally, even courts that refer to the "certainty of hopelessness" do not require absolute hopelessness. In Triplett v. ACS/PNC

13

Educ. Loan Ctr. (In re Triplett), 357 B.R. 739 (Bankr.E.D.Va. 2006), the court not only tempered the phrase but referred back to the actual standard, explaining that "the certainty of hopelessness in making future payments is based on the presence of unique or extraordinary circumstances which would render it unlikely that the debtor ever would be able to honor his [or her] obligations." Id. at 743 (internal quotations omitted).

Accordingly, this Court reiterates and applies the standard articulated by the Second Circuit: "additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans" or, stated another way, "Requiring evidence not only of current inability to pay but of additional, exceptional circumstances, strongly suggestive of continuing inability to pay over an extended period of time, more reliably guarantees that the hardship presented is 'undue.'"[2] Brunner, 831 F.2d 396. The "certainty of hopelessness" phrase, while descriptive, cannot substitute as a standard, particularly when the Second Circuit never enunciated it.

Additional and exceptional circumstances have been depicted as circumstances where "the debtor experienced an illness, developed a disability, or became responsible for a large number of dependents after receiving the [student] loan." In re Thoms, 257 B.R. 144, 149 (S.D.N.Y. 2001). See Kelsey v. Great Lakes Higher Educ. Corp. (In re Kelsey), 287 B.R. 132, 142, 144 (Bankr. D.Vt. 2001).

### 2.   *Analysis of the Testimony and Other Evidence*

With the standard for the second Brunner prong clarified, the Court turns to the testimony and evidence admitted at trial. Applying the standard to the instant evidence, the Court finds that the debtor has met his burden of proof under this prong.

In this case, the Debtor, his mother, and Dr. Hickey testified compellingly about King's significant and debilitating psychological disorders that have impeded and continue to impede his ability to obtain employment. Although King testified that he desperately wanted to return to work and had made a valiant effort to secure employment, his efforts over the past years have come to naught, he has given up trying to find a job in his field of expertise, and has no hope of finding such a position in the future. His mother, who very much wanted her son to succeed, has instead seen her son, with a master's degree and an impressive academic record, deteriorate and become a "lost soul." The testimony of Dr. Hickey, a qualified psychiatrist and extremely credible witness who had treated King for over five years and whose direct clinical observations over that extended period of time, deserves substantial weight. The Court found her to be competent, confident, honest, and very familiar with King's condition. She revealed no bias, hesitation, or lack of professional objectivity. She placed King's employment prospects in context, allowing the Court to assess how the additional and extraordinary circumstances of King's significant

---

[2] The Court notes that in one articulation, the Second Circuit required "additional" circumstances, and in another, it required "additional, exceptional circumstances." This appears to be a distinction without a difference, as the case law clearly requires additional, exceptional circumstances beyond garden-variety hardship in order to establish that the hardship is "undue."

14

psychological disorders currently impacted and would continue to impact his efforts to find and hold a job. Dr. Hickey was unequivocal that, while she remained "positive" about King because he was motivated, intelligent, well-educated, wanted a job, cared about being successful and was committed to being helpful to his family, she felt he would be unable to attain and hold the type of job that would allow him to pay off his student loans. She supported her conclusion by pointing to his high levels of anxiety and depression in job settings that diminished his ability to be effective both in job interviews and on the job (doc. # 40 at 23, 26). She also observed that lurking behind his bipolar diagnosis was suicidal ideation, id. at 17, and the great stresses in his life with which he cannot cope. Most important, however, was Dr. Hickey's evaluation that "he has gotten worse," that bipolar disorder is a lifelong disorder, that his living circumstances and inability to find a job will continue to produce great stress for him, and that it is more likely than not that his debilitating condition will persist for an indefinite period and could be permanent, id. at 15, 24, 31.

The most critical question when assessing a mental condition pursuant to the second Brunner prong is whether that debilitating condition is long-term, *i.e.*, expected to extend into the future such that employment is not a possibility and repayment is not an option. See Congdon, 2007 WL 942202 at * 8 ; Nash v. Conn. Student Loan Found. (In re Nash), 330 B.R. 323, 327, aff'd 446 F.3d 188, 194 (1st Cir. 2006); Shilling v. Sallie Mae Servicing Corp. (In re Shilling), 333 B.R. 716, 722 (Bankr. W.D.Pa. 2005). Based predominantly upon Dr. Hickey's testimony, but also upon the testimony of King and his mother, the Court concludes that the Plaintiff's condition is indeed debilitating and long-term.

ECMC has argued that because Dr. Hickey did not regard King's situation as hopeless, as illustrated by (1) her checking the "temporarily totally disabled" box on Ex. I, and acknowledging, in response to ECMC's question that, at the time she checked that box, her assessment of King's case was "not totally hopeless"; and (2) her acknowledgment that Dr. Hammer's prognosis was "considerably more hopeful" than hers, that King's evidence was insufficient to satisfy the Plaintiff's burden of proof on this prong. The Court rejects these arguments on two grounds. First, this Court rejects an "absolute hopelessness" standard as a *sine qua non* factor for meeting the second Brunner prong. Second, these examples are not compelling and do not constitute a preponderance of the credible evidence. At the same time that Dr. Hickey checked the "temporarily totally disabled" box, she also wrote "James is probably permanently disabled but I cannot say absolutely that there is no hope." This statement about likely permanent disability neutralizes her selection of the temporary disability designation – or at the very least further explains why she checked the box. It was also apparent to the Court that Dr. Hickey, as a consummate and compassionate professional, was aware that her patient was in the same room listening to her testimony. Although she had candidly asserted that King's condition had worsened, given the totality of the circumstances, it seems quite probable that she would refrain from characterizing King's

15

situation as hopeless to avoid causing deeper depression or inflicting additional stress on a sensitive, intelligent, troubled, fragile and acutely aware patient.

Dr. Hickey also placed Dr. Hammer's "more positive" prognosis in context. She said Dr. Hammer's evaluation revealed "the same kind of hope" that she initially had when she saw King for the first several years. Dr. Hammer had taken a snapshot of King's life at one point in time by administering a psychological test. However, answers to questions on a test, scored statistically, could not provide the kind of reliable or sophisticated analysis that Dr. Hickey had gained by treating King on a monthly basis over five years. Moreover, Dr. Hammer's recommendations were conditional, speculative and tentative. For example, he concluded, "*If* the treatment could help him to develop his self confidence and to better manage his emotional distress, *perhaps* he could be able to actualize his potential. . ." Lastly, Dr. Hammer signed his report as a Psychological Trainee, leaving the Court to wonder how much experience he had in making such evaluations. For all of these reasons, the Court finds ECMC's challenges to Dr. Hickey's testimony unavailing.

ECMC pointed to LeRoy's testimony that King was more likely to succeed than not, and that with supported employment, King could earn from $25,000 to $30,000 in his hometown, as evidence that King failed to establish the second Brunner prong and that there was a "certainty of hope." The Court, however, finds LeRoy's testimony generally unhelpful and gives it little weight. For example, LeRoy gave only lip service to the impact that King's psychological issues could have on his ability to obtain and keep a job, as well as what kinds of jobs might be available. He ignored Dr. Hickey's testimony that King had "gotten worse" over the years, that King's depression and anxiety affected his functioning in general and on jobs in particular, and that King's job difficulties became "very severe stresses" (doc. # 40 at 18). Instead, LeRoy focused on King's past academic achievements, his two one-year jobs, and his part-time jobs and treated those experiences as offsetting King's downward spiral over the past five years.

The Court also finds unpersuasive LeRoy's statement that Dr. Hickey's vocational assessment of King was beyond the scope of her expertise because she did not have the training to understand how to translate diagnosis and functional challenges of a patient into the work world. This Court finds Dr. Hickey well-qualified to discuss how King's constellation of issues are likely to manifest themselves in work situations, and therefore discounts LeRoy's opinion that her prognosis is not well-founded.

The Court further finds LeRoy's suggestion that "it is more probable than not" that King would be able to obtain an entry-level white collar job rather specious. LeRoy's predictions in this regard were without foundation. He admitted that he could not speak to actual job availability, and instead stated that human relations jobs exist in any market, and he admitted that these jobs were viable options only if employers in the area were willing to participate in supported employment. Also, LeRoy opined that King should seek a human resources job, even though King's psychological profile, as illustrated very clearly

16

in the testimony and in court exhibits, showed that he was not a "people person" and in fact had difficulty establishing relationships. See Ex. H ("Interpersonal relationships appear to be problematic. He seems to lack basic social skills and is socially withdrawn due to a lack of self-confidence and shyness. These characteristics may contribute to his tendency toward interpersonal avoidance."). In contrast to Dr. Hickey, LeRoy struck the Court as a rather blatant advocate and as a witness who lacked the objectivity and specific factual information necessary to persuasively support the Defendants' position. In sum, since he lacked specific data about available and realistic job opportunities, and did not consider King's actual and undisputed symptoms, LeRoy's testimony did not diminish the strength, value or persuasiveness of Dr. Hickey's testimony.

For these reasons, the Court finds that King therefore has met the second prong of the Brunner test: he has shown, by a preponderance of the evidence, that additional and exceptional emotional/ psychological circumstances exist in his life indicating that this state of affairs is likely to persist for a significant portion of the loan repayment period and that repayment of these loans will cause an undue hardship.

### C.  The "Good Faith" Prong

The final prong of the Brunner test requires a debtor to show that he has "made good faith efforts to repay the loans," Brunner, 831 F.2d at 396, and is measured by the debtor's "efforts to obtain employment, maximize income, and minimize expenses." O'Hearn v. Educ. Credit Mgmt. Corp. (In re O'Hearn), 339 F.3d 559, 564 (7th Cir. 2003). Many courts of appeal have held that a debtor's "effort to seek out loan consolidation options that make the debt less onerous is an important component of the good faith inquiry," as it "illustrates that the debtor takes her loan obligations seriously and is doing her utmost to repay them despite her unfortunate circumstances." Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour), 433 F.3d 393, 402 (4th Cir. 2005) (citing Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete), 412 F.3d 1200, 1206 (10th Cir. 2005); Tirch v. Pa. Higher Educ. Assistance Agency (In re Tirch), 409 F.3d 677, 682-83 (6th Cir. 2005)). This represents an indicia of good faith, but it is not a *per se* requirement, see Cota v. U.S. Dep't of Educ. (In re Cota), 298 B.R. 408, 420 (Bankr. D.Ariz. 2003), and this Court does not deem it mandatory.

VSAC did not contest that King satisfied this prong of the test. ECMC did, raising the question "What if he is able to start working again? Where does that leave us?" ECMC answered its question by focusing on the Income Contingent Repayment Plan ("ICRP") offered by the U.S. Department of Education. Counsel referred to the statement of facts, wherein the parties had stipulated that King had been informed of the ICRP program in February 2005, that King was eligible for the ICRP as a matter of law, and that his payments would be zero per month given his current income level and marital status. While acknowledging that King had maximized his income, minimized his expenses, and made

17

reasonable efforts to obtain employment "in many ways," counsel pointed out that King had nevertheless not taken advantage of the ICRP. Counsel emphasized that since King had benefited from public funds for his education and his disability, he was obliged to explore all avenues to insure that if he could meet his loan obligation prior to being eligible for discharge he should, and when his payment was zero, it was hard to understand how that would work a hardship on him, much less an undue hardship. He argued that under the ICRP, the Debtor was protected, given his current income and that the public was protected by the possibility of repayment remaining open, and that went to the heart of the good faith prong.

ECMC's policy argument is eloquent, but it does not carry the day. First, this Court has held that failure to seek out loan consolidation options, such as the ICRP program, is not sufficient, in and of itself, to justify a finding that King lacked good faith. See Congdon, 2007 WL 942202 at * 11. Second, there can be no question that the Debtor has made yeoman and persistent efforts to maximize income, minimize expenses, and obtain employment. He has made unrelenting, wide-ranging, and extensive efforts to find a job (and thereby maximize his income). He has consulted with a Vermont State Rehabilitation Counselor for at least four years and is taking part in the supported employment program offered by UCS. Even if he does obtain a job in the UCS program, it would more likely than not pay a minimum wage and be only part-time. In addition, he has been conscientious in paying on his loans when he could, or obtaining deferments and forbearances when he could not make payments. Exhibit 6 shows that he was in regular communication with his lenders and made requests for forbearance and deferments from 1995 to 2005. He also took he job at Americorps/Vista because it covered the interest on his student loans for a year, even though this was a far cry from the kind of government position that he had always dreamed of and for which he had been educated. His expenses could not be more reasonable or minimal.

Third, although ECMC presses for an order directing the Plaintiff to participate in the ICRP, that program would not discharge the debt. Instead, the debt would remain in abeyance, and if King was able to obtain a job, the zero payment could be modified and he would again be faced with the reality of a looming and enormous debt. The Court agrees with the Plaintiff that if the ICRP program was legally required, it would obviate the need for the undue hardship test because no matter how difficult a debtor's circumstances might be, there would be no right to relief even if the three prongs of the Brunner test were otherwise met.

Finally, the debt, as testified to by Dr. Hickey and King, has been a constant source of stress in King's life. A statement from Kelsey bears repeating at this juncture:

> Under the circumstances, the Court finds a credible risk of serious injury, including relapse and suicide, if the debtor is unable to discharge these debts and thus remains subject to future collection activity and compelled to seek and retain employment sufficient to repay these substantial debts. A debtor's 'fresh start' is undermined if it comes at such a perilous price.

18

Kelsey, 287 B.R. at 144. While the Debtor here may not be at the same risk of suicide as the debtor in Kelsey, the Debtor has established the three Brunner prongs. He is entitled to a discharge of the student loan debt. Placing him in a limbo state where the debt is merely in abeyance or postponed is not adequate relief under the circumstances. In Reed v. SLM Corp. (In re Reed), 2005 WL 1398479 (Bankr. D.Vt. June 13, 2005), this Court approved a partial discharge based on the fact that the debtor's future prospects suggested that she might be able to repay a portion of her student loan, because her net disposable income was "likely to increase in the near future to a level sufficient for her to make a meaningful repayment." Id. at * 4. That is not the case here.

Taking into consideration the totality of the circumstances regarding the Plaintiff's efforts to maximize income, minimize expenses, and repay the subject loans, the Court concludes that the Plaintiff has unquestionably established the good faith standard of the Brunner test.

## CONCLUSION

The Court finds that the Plaintiff has satisfied the criteria required by the Brunner test and has proved by a preponderance of the evidence that compelling him to repay his student loans would impose an undue hardship upon him. The Court therefore declares the Plaintiff's student loans to Defendants ECMC and VSAC to be discharged pursuant to 11 U.S.C. § 523(a)(8) and will enter an order granting a corresponding judgment in favor of the Plaintiff.[3]

This constitutes the Court's findings of fact and conclusions of law.

May 11, 2007  
Rutland, Vermont

Colleen A. Brown  
United States Bankruptcy Judge

---

[3] Since Defendant Wells Fargo did not file an answer and the Plaintiff presented no evidence regarding this debt, the Court does not adjudicate the dischargeability of that student loan obligation. The adversary proceeding is therefore not fully resolved by the instant memorandum of decision.